# The Phœnix Fire Insurance Company *versus* Cochran *et al.*

1. The terms "deviation" and "departure," in a marine policy, are in most cases synonymous, both meaning a violation of some express or implied provisions of the contract; and underwriters can be discharged only by showing that the assured had *deviated* or *departed* from their contract. (*Per* Hampton, P. J., approved by Supreme Court.)

2. When the *proximate* cause of the loss is one of the perils insured against, although the *remote* cause was the negligence of the assured, his agents or servants, the underwriters are liable, if there be no fraudulent or barratrous design. *Id.*

3. The insurance in this case was on two policies of same date for $5000 each, for one year, on oil in bulk or "barrels, on board the good barges trading," as to one policy, " between the wells on Oil Creek, Allegheny river and Pittsburgh," as to the other, "between Oil City and Pittsburgh ;" the wells on Oil Creek are above Oil City, which is at the mouth of Oil Creek. *Held,* that these points were descriptive of the *barges*, not of the *freight*, and that wherever the oil was taken on or delivered between these points, it was within the policies, if the barges were trading between these points.

4. *Held,* also, that the plaintiffs might recover on both policies for the whole of their actual loss, although it exceed the sum mentioned in either policy, if less than the aggregate of both.

ERROR to the District Court of *Allegheny county.*

This was an ·amicable action to recover for loss on two policies of insurance, issued by the defendants below to the plaintiffs, numbered respectively 359 and 360, dated March 24th 1864, for $5000 each, for one year, " on petroleum oil in bulk or barrels, * * * laden or to be ·laden on board the good barges trading between the wells on *Oil Creek, Allegheny river and Pittsburgh*" (in No. 359), and in " *barges trading between Oil City and Pitts- burgh*"· (in 360). On each policy was endorsed " Forty-eight hours allowed after arrival for unloading."

The perils insured against were those of the "lakes, seas, rivers, canals, railroads, fires, jettisons, that have or shall come to the hurt, detriment or damage of the said property or any part

thereof." The risk on one policy was at 8 per cent. premium, and on the other at 9 per cent.

Oil City is on the Allegheny river, at the mouth of Oil Creek, and the " wells" are on the creek above.

About April 7th 1864, a quantity of oil in bulk was put into a " good barge" for plaintiffs at the " wells" and brought down to Oil City, where more oil in bulk was added, making seven hundred and forty-three ·barrels in the whole in bulk, and forty barrels in barrels, which were put on the deck. There were also one hundred and forty barrels of oil in barrels put on a steamboat belonging to plaintiff, and the barge was taken in tow by the steamboat and brought to Forsyth's landing, near Pittsburgh. After the barge was moored in a *safe* harbour, the forty barrels were taken from the barge and the one hundred and forty barrels were taken from the steamer and put on the barge for the purpose of being landed. This was done by direction of the plaintiff's agent, *if the captain thought it would be safe.* The barge was from five to eight inches out of the water after the one hundred and forty barrels were put on board, and was carefully tied. About dusk the steamer left the barge. At eleven o'clock the barge was examined and found to be safe. Next morning the stern was submerged, five barrels gone from the deck and all the oil lost from the hold. There was evidence that there was a scratch on the side of the barge, as if struck by some floating object; also that the risk was not increased materially, if at all, by putting the one hundred and forty-three barrels on the deck of the barge, some witnesses testifying, however, that the risk would be increased under certain circumstances, which might cause the barrels to move.

On the trial the defendant, amongst other points, submitted the following :—

1. That the putting on the deck of the barge of between one hundred and forty and one hundred and fifty barrels filled with oil after she had arrived at the place of destination and been moored safely, was such a departure from the contract or contracts of insurance in this case as discharged the defendants from their liability, without reference to whether the degree or period of the risk was thereby increased or not.

3. That the plaintiffs are not entitled to recover under policy No. 359, the same purporting to cover oil in bulk or barrels, contained in barges trading between the wells on Oil Creek and Pittsburgh.

4. If the court should decline to affirm the third point they are requested to charge that the plaintiffs are not entitled to recover on both policies to the extent of their loss; but if entitled to recover on both policies, then only to the amount of $5000—the amount of each policy, with interest from the time the loss was payable.

8. That under all the evidence in the cause the plaintiffs are not entitled to recover.

The court (Hampton, P. J.) reserved the first point; and on the third and fourth points charged that the testimony raised " a mixed question of law and fact; the former for the determination of the court, the latter for the jury.

" The question of fact for you to determine is, whether this 143 barrels being placed on the deck of this barge exposed the oil in it to any greater danger of being lost, either by the boat being struck by any floating body, or by the violence of the winds or waves, or of being sunk by the increased weight, than it would have been if they had not been placed there ? Or, in other words, was this oil in bulk—that is, in the barge—in greater danger of being lost with the barrels on board, than it would have been without them ? You will determine whether the loss was in whole or in part the result of the plaintiffs' conduct, in using the deck of the barge as a place of temporary storage, or deposit of property not covered by the policy ? And if you so find, then we instruct you, as matter of law, that the plaintiffs are not entitled to recover, and your verdict should be for the defendants.

" But if you should find otherwise, that is, that the danger was not increased or enhanced by these barrels being placed there, then you will find for the plaintiffs the cash value of the oil in bulk, at the time of the loss, with interest thereon, from the time it ought to have been paid, according to the terms of the policies of insurance."

The court refused all the other points of defendant. The jury found for the plaintiffs $6423.33, subject to the opinion of the court on the point reserved. ·

Hampton, P. J., afterwards delivered the opinion of the District Court on the reserved point, after stating the facts, as follows :—

" The main question in the cause, and the one on which it must finally be decided, is, whether the conduct of the plaintiffs' servants in placing the 140 (or 143) barrels of oil on the deck of the barge, released the underwriters from their contract of insurance. If it did, of course they are not responsible ; but if not, the plaintiffs are entitled to recover.

" This question was presented by the defendants' counsel in two aspects—First, as a question of law ; and second, as a mixed question of law and fact.

" His first position was, that the placing these barrels on the deck was a *departure* from the contract of insurance, which discharged the insurers, in law, without regard to the fact whether the risk was enhanced thereby or not. This question was reserved."

[The judge then discussed other points propounded below, which are not involved in the errors assigned here, and proceeded :]

1 P. F. Smith—10

[Phœnix Fire Ins. Co. *v.* Cochran.]

" The point presented by the defendants' counsel and reserved by the court is as follows, viz. :

" ' 1. That the putting on the deck of the barge of between 140 and 150 barrels filled with oil, after she had arrived at the place of destination and been moored safely, was such a departure from the contract or contracts of insurance in this case as discharged the defendants from their liability, without reference to whether the degree or period of the risk was thereby increased or not.'

" This idea of a ' *departure*' from the contract of insurance comes under the head and arises out of the law on the subject of ' *deviation*' in marine policies ; and is only applicable when the insured has done some act in violation of his contract. The term deviation is used to denote any unnecessary or unauthorized departure from the usual course, or general mode of carrying on the voyage insured by which the risk is altered, though the original terminus *ad quem* of the voyage insured is still kept in view : 1 Arnould 347. The terms ' deviation' and ' departure' are used in most cases as synonymous. The one being used to express a variation from the usual course or conduct of the voyage—the other to denote some other violation of the contract of insurance while touching at intermediate ports. But both meaning nothing more nor less than a violation of some express or implied provisions of the contract.

" On this ground was the decision based in the case of Maryland Ins. Co. *v.* Le Roy, 7 Cranch 26, cited and relied on by defendants' counsel. The assured there were guilty of a clear violation of their contract, by which the underwriters were discharged.

" That was an action of covenant brought by Le Roy and others against the Maryland Ins. Co. upon a policy of insurance on the ship John, from New York to five ports on the coast of ' Africa, between Castle D'Elmina and Cape Lopez, including those ports, and at and from them, or either of them, back to New York, with liberty as per order of insurance.' The vessel was authorized by the terms of the policy to touch at the Cape de Verd Islands for the purchase of stock, such as hogs, goats and poultry, and taking in water. The ship in the prosecution of her voyage arrived at the island of Fogo, one of the Cape de Verd Islands, on the 7th of May 1805, where the captain received on board four bullocks and four jackasses, besides water and other provisions, and unstored the dry goods and broke open two bales, and took out forty pieces of each for trade. The ship remained there until 24th of May. The time generally employed by a vessel in taking in stock and water at the Cape de Verd Islands, was from two to three days, unless the weather should be very unfavourable ; the weather was good, and the bullocks and jackasses encumbered the deck much more than small stock would have done. After

having given in evidence the foregoing facts, the defendants' counsel prayed the court to direct the jury that if they believed the same, then the taking the said jackasses on board the ship while she lay at the island of Fogo, was not within the privilege allowed to the plaintiffs in this cause to touch at the Cape de Verd Islands, in the performance of the voyage insured, for the purchase of stock and to take in water, and therefore vitiated the policy. This instruction the court refused to give, but instructed them that these facts did not vitiate the policy unless the risk was thereby increased. The jury found a verdict for the plaintiffs, and the defendants sued out a writ of error and took the case to the Supreme Court.

" The opinion of that court was delivered by Johnson, J. He says : 'The opinion prayed for was, that by taking in at Fogo an additional cargo not sanctioned by the contract of insurance, the insurers were discharged from their liability under the policy;' and after referring to the charge of the court below he says : ' In this charge this court are of the opinion the court below erred. The discharge of the underwriters from their liability in such cases depends, not upon any supposed increase of risk, but wholly on the departure of the insured from the contract of insurance. The consequences of such violation of the contract are immaterial to its legal effect, as it is *per se* a discharge of the underwriters, and the law attaches no importance to the degree in cases of voluntary deviation. Necessity alone can sanction a deviation in any case, and that deviation must be strictly commensurate with the *vis major* producing it.'

" In order further to show that ' deviation' and ' departure' are convertible terms, and both used to denote a breach of the contract of insurance, I refer to Arnould on Insurance, vol. 1, 348. Treating of deviation and change of risk, he says : ' The true proposition, therefore, is that every voluntary and unnecessitated *departure* from the prescribed course of the voyage by which the risk is *varied*, is a *deviation*, whether the risk be thereby increased or not.'

" In Hughes *v.* The Union Ins. Co., 3 Wheat. 159, the case of The Maryland Ins. Co. *v.* Le Roy came under review, and was approved on the ground that the assured had violated or departed from their contract by the long delay at the island of Fogo, and doing acts which tended to increase the risk, and which they were not authorized to do by the terms of their policy.

" These and other kindred cases go to show that the underwriters in a marine policy, where the loss is by a peril insured against, can only be discharged by showing that the assured have *deviated* or *departed* from their contract.

" We are now prepared to inquire whether the case before us falls within the rule of these cases. The property insured was

[Phœnix Fire Ins. Co. *v.* Cochran.]

' oil in bulk or barrels, laden on good barges trading between the wells on Oil Creek and Oil City, Allegheny river and Pittsburgh. Beginning the adventure from and immediately following the loading thereof at the port or placed named, and to continue and endure until the same shall arrive and be safely landed at the port of destination,' and for forty-eight hours afterwards for the purpose of unloading. The perils insured against were those of the ' lakes, seas, rivers, canals, railroads, fires, jettisons, that have or shall come to the hurt, detriment or damage of the said property, or any part thereof.'

" Let us now inquire what were the legal responsibilities of each party to this contract.

" The proximate cause of the loss here was by a peril insured against, viz., the sinking of the barge ; and, for the sake of the argument, although the jury have found otherwise, let it be conceded that the remote cause was the negligence of the captain and crew in placing the barrels on deck. It was not pretended, nor could it be under the evidence, that there was any fraudulent or barratrous design in placing them there, and therefore it could only be an act of negligence at most. And first, it is very clear this act was not in violation of any *express* provision in the policy. It expressly provides that oil in *barrels* may be carried on barges, which could only be done by placing them on the deck when the barge was fitted up, as is universally the case for carrying oil in bulk. And it was conceded at bar by the learned counsel for the defendants, that if the barrels had been placed there at the beginning, or at any time during the voyage, and the barge had been sunk, the underwriters would have been liable ; because, as he alleges, that would have been a mere act of negligence, and not a ' *departure*' from the contract. This seems to me to be a distinction without a difference. If it would have been no violation of the contract in the middle of the voyage, it is difficult to perceive how it became so after the vessel reached the harbour, and during the continuance of the risk.

" If the act complained of was no violation of the express provisions of the contract, was it forbidden by any of its *implied* conditions ? And this leads us to inquire what were the implied conditions of these policies ?

" In 2 Arnould on Insurance 770, it is said, ' The principle established by the more recent authorities in this country is, that, supposing the vessel, crew and equipments to have been originally sufficient, and a captain to have been provided of competent skill, the assured has done all that he contracted to do ; and the underwriter is, in such cases, liable for any loss *proximately* caused by the perils insured against, although it may have been remotely occasioned by the negligence or misconduct (not amounting to barratry) of the captain or crew, whether such negligence or mis-

[Phœnix Fire Ins. Co. v. Cochran.]

conduct consist in omitting some act which ought to be done, or doing an act which ought not to be done, in the course of the navigation. The same principle appears, at length, after much fluctuation in the decisions, to have been established in the United States :' 2 Pars. Mar. Law, 212, n. 1, 225 ; 1 Phillips on Insurance, Pl. 1049.

" The rule here stated is clearly sustained by all the modern decisions in England, from 2 B. & Ald. 72, down to 14 Meeson & Welsby 476. And in the Supreme Court of the United States, from The Patapsco Insurance Co. v. Coulter, 3 Peters 222, to The General Insurance Co. v. Sherwood, 14 Howard 365, as well as by numerous well-considered cases in several of our sister states.

" If this rule be applied to the present case, it will be difficult to find a violation of any implied condition or provision of the contract under consideration. The barge was shown to be good, and the captain and crew of the steamboat having it in tow competent and skilful. The assured, it is conceded, had a right, by the express terms of the contract, to carry oil in barrels on the deck of the barge during the voyage ; and if so carried they might have remained there during the forty-eight hours allowed by the policy for unloading, after the termination of the voyage. Had this been done, and the barge been sunk, as it was, within the forty-eight hours, the underwriters would have had no defence, even if it had been clearly proven that the weight of the barrels, coupled with the manner of chalking them, was the remote cause of the barge being sunk. The case would then have been embraced by the rule established by the numerous class of modern decisions already referred to, viz.: That when the proximate cause of the loss was one of the perils insured against, although the remote cause was the negligence of the assured, his agents or servants, the underwriters are liable.

" And here, perhaps, this discussion ought to close ; but I am inclined to notice a few of the modern cases, establishing the foregoing principle.

" The leading case in England where this question was first fully and thoroughly discussed and determined, in the way above stated, is that of Busk v. The Royal Exchange Assurance Co., 2 B. & Ald. 72. The facts were briefly these : A Russian ship which was seaworthy at the commencement of the risk, and navigated by a competent master and crew, was compelled, in the course of the voyage from Amsterdam to St. Petersburg, to winter in a port in the Gulf of Finland, where she was left, as is usual under such circumstances, in charge of the mate, who was quite sufficient for her safe custody. Owing to the negligence of this person in not extinguishing a fire which he had lighted in her cabin, the ship was burnt while he was absent on board another vessel. The court held, that as the loss of the ship was

[Phœnix Fire Ins. Co. v. Cochran.]

proximately caused by fire (one of the perils insured against) the underwriters were liable, though it was remotely occasioned by the negligence of the mate.

"The same doctrine was laid down in a case where a quantity of sugar was lost while being conveyed from the ship to the shore, according to the usage of the West India trade, in a sloop adequately manned for the purpose, which was drifted on the rocks, in consequence of the seamen in charge of her all going to sleep, in gross neglect of their duty. Walker *v.* Maitland, 5 B. & Ald. 171. Abbott, C. J., says: ' In this case the immediate cause of the loss was the violence of the winds and the waves. No decision can be cited, where, in such a case, the underwriters have been held to be excused in consequence of the loss having been remotely occasioned by the negligence of the crew. I am afraid of laying down any such rule ; it will introduce an infinite number of questions, as to the quantum of care which, if used, might have prevented the loss.'

"'Bayley, J., in the same case says : ' Here the loss arose from the sloop, with the goods on board, having been beat to pieces by the force of the winds and waves ; and the question in this case is, whether the underwriters are exonerated from the loss, by proving negligence on the part of the crew, although the damage was occasioned by the perils of the sea. It is the duty of the owner to have the ship properly equipped, and for that purpose it is necessary that he should provide a competent master and crew in the first instance ; but having done that, he has discharged his duty, and is not responsible for their negligence, as between him and the underwriters.' The same principle is laid down in Bishop *v.* Pentland, 7 B. & Cress. 218, where the foregoing cases are cited and approved. See also Holdsworth *v.* Wise, Id. 794, and note 798, where Lord Tenterden, C. J., said : ' We are all of opinion that underwriters are responsible for the misconduct or negligence of the captain and crew : but the owner, as a condition precedent, is bound to provide a crew of competent skill.' Phillips *v.* Headlaw, 2 B. & Ald. 380 ; Dixon *v.* Sadler, 5 Mees. & Wels. 405, s. c. confirmed in error, 8 Id. 895 ; Redman *v.* Wilson, 14 Id. 476.

"The same doctrine is now firmly established in the United States. The first case which brought the question fairly before the Supreme Court of the United States is The Patapsco Insurance Co. *v.* Coulter, 3 Peters R. 222, where it was held that where a policy covers the risks of fire and barratry, and fire is the proximate cause of the loss, the underwriter cannot defend upon the ground that negligence caused the fire. Justice Johnson delivering the opinion says : ' It was not until the year 1818 that the question was settled in the British courts, on the liability of the underwriters for a loss like the present. In the case of Busk *v.*

[Phœnix Fire Ins. Co. v. Cochran.]

The Royal Exchange Assurance Co., 2 B. & Ald. 73, the question is fully and finally decided in direct hostility with the decision in New York; and this court is now, for the first time, called upon to establish a rule for its own government in similar cases.'

" The question next came before the same court in the case of The Columbia Ins. Co. of Alexandria v. Lawrence, 10 Peters 507, where it was held that a loss by fire occasioned by the negligence of the assured or his servants, without fraud or design, is within the policy, and the underwriters are liable.

" Shortly afterwards the case of Waters v. The Merchants' Louisville Ins. Co., 11 Peters 213, came before the court. Justice Story, delivering the opinion of the court, goes into a thorough examination of both the English and American cases, and lays down the rule as follows: ' Whether the risk of barratry is taken or not, a loss whose proximate cause was a peril insured against, is within the policy, though remotely occasioned by the negligence of the master and crew.' ' If we look,' he says, ' to the question upon mere principle, without reference to authority, it is difficult to escape from the conclusion that a loss by a peril insured against, and occasioned by negligence, is a loss within a marine policy, unless there be some other language in it which repels that conclusion. Such a loss is within the words, and it is incumbent upon those who seek to make any exception from the words, to show that it is not within the intent of the policy. There is nothing unreasonable, unjust or inconsistent with public policy in allowing the insured to insure himself against all losses from any perils not occasioned by his own personal fraud.' * * * He then quotes from Bayley, J., in Busk v. Royal Ex. Ass. Co.: ' The underwriter being therefore liable *primâ facie*, by the express terms of the policy, it lies upon him to discharge himself. Does he do so by showing that the fire arose from the negligence of the master and mariners? If, indeed, the negligence of the master would exonerate the underwriter from responsibility in case of loss by fire, it would also in cases of a loss by capture, or perils of the sea.'

" Other portions of this elaborate opinion, bearing directly on the question before us, must be omitted for want of space.

" In The General Mutual Ins. Co. v. Sherwood, 14 Howard 365, Curtis, J., says: ' Where a peril of the sea is a proximate cause of the loss, the negligence which caused that peril is not inquired into; not because the underwriter has taken upon himself all risks arising from negligence, but because he has assumed to indemnify the assured against losses from particular perils, and the assured has not warranted that his servants will use due care to avoid them.'

" In Nelson *et al.* v. Suffolk Ins. Co., 8 Cushing 496, Fletcher, J., says: ' The great principle now established is, that if the

[Phœnix Fire Ins. Co. *v.* Cochran.]

master, vessel, officers, crew and equipments are competent and
sufficient at the commencement of the voyage, the assured has
done all that he contracted to do. He did not guarantee the
faithfulness and vigilance of the master and crew, and he is not
responsible for their negligence ; but for the conduct of the master
and mariners in the practical navigation and management of the
vessel after the commencement of the voyage, the insurers are
responsible, provided the actual loss arise from one of the perils
insured against, though such peril may have occurred in conse-
quence of the negligence or carelessness of the master and crew.'
He further says : ' When a peril insured against actually happens,
all the negligence connected with it is at the risk of the under-
writers, and all the consequences of the negligence fall on them.'

"In Perrin *v.* The Protection Insurance Company, 11 Ohio R.
147, it was held that in an action on a policy of insurance it is
no defence to show that the loss was occasioned by negligence in
the agents of the insured.

"The Supreme Court of our own state adopted the same rule in
the case of The American Insurance Company *v.* Insley, 7 Barr
223, where it was held that it is no defence to an action on a
marine policy of insurance that a loss directly caused by a peril
of the sea happened through the negligence of the captain and
crew. Gibson, C. J., after stating that the rule in England on
the subject of the negligence of the insured had been changed,
says : ' In America the lead of the English courts has been fol-
lowed, in effect, by the Supreme Court of the United States, and
by the courts of Massachusetts, Maryland, Louisiana and Ohio,
all, but the last, seaboard states ; and the question is, whether we
shall fall in with the tide or stand out on the ground of the old
English law ? It is true, that the courts of New York have not
yet abandoned their primitive decisions, but in that respect our
position is a more favourable one, standing as we do, unfettered
by any precedent of our own. The courts of Massachusetts, how-
ever, have abandoned theirs, and have embraced the new doctrine,
though they had at first proceeded in a different direction—a sure
proof of its convenience and justice.'

"Again : he says, ' Public policy requires no more than that a
man be not suffered to insure against his own knavery, which is
not to be protected or encouraged by any means ; for although
the maxim *respondeat superior* is applicable to the responsibility
of a master for the acts of his servants, yet the insured, so long
as he acts with fidelity, is answerable neither for his servants nor
for himself. Thus we see that there is nothing impolitic, unrea-
sonable or unjust in the modern doctrine, and why shall we not
adopt it at the outset ? The law of insurance is a branch of the
public law ; and I feel myself as firmly bound by the decisions

[Phœnix Fire Ins. Co. v. Cochran.]

of the English and American courts, in regard to it, as I do by our own.'

" With this array of authorities before us it is impossible to discover any fact in this case sufficient to discharge the defendants from their liability as underwriters.

" By the express terms of the contract the plaintiffs had the right to place these barrels on the barge at the commencement, and carry them there throughout the entire voyage, and keep them there for forty-eight hours after it was determined. And it could be no violation of that right to put them there at any time during that period. And if sufficient care or caution was not observed either as to the number of barrels put on the deck of the barge, or the manner of chalking them, so as to render the boat more secure, it was nothing more than an act of negligence, which, we have seen, cannot avail the defendants. There was, therefore, no ' departure' from nor violation of any express provision of their contract.

" The plaintiffs provided a vessel entirely seaworthy, with all the necessary equipments for the voyage, and officers and crew competent and skilful; and therefore there was no violation of any implied condition in the contract. The loss occurred by one of the perils insured against, and therefore the defendants are responsible.

" Let judgment be entered on the verdict, on the question of law reserved."

In this court the errors assigned were:—

1. The court's refusal of the defendants' third point.
2. The refusal of the fourth point.
3. The refusal of the eighth point.
4. Entering judgment on the reserved point.
5. Instructing the jury that the plaintiffs might recover their actual loss under both policies.

*Hamilton & Acheson*, for plaintiffs in error.—As to the first, second and fifth errors. This was not a case of double insurance; the policies are not on the same subject, one being on oil on barges, trading between " wells on Oil Creek and Pittsburgh," the other " on oil in barges between Oil City and Pittsburgh." The points of departure are different geographically, and also in a commercial sense: 1 Phillips on Insurance 199, § 15; Sloat v. Royal Ins. Co., Phila. Leg. Int. December 16th 1864.

The bill of lading shows that the voyage of the lost barge commenced at Oil City.

As to the fourth error, the point reserved. The voyage had actually terminated at Forsyth's landing, and the risk terminated; the " forty-eight hours" were allowed for unloading, but for no other purposes. The putting on deck, therefore, of one hundred

and forty-three additional barrels of oil, for temporary storage, was varying the risk and discharged the underwriters. Deviation is enhancing.or varying the risk, without necessity or just cause : 1 Phil. on Ins. 561, ch. 12, § 1 ; Coffine *v*. Newburyport Ins. Co., 9 Mass. Rep. 447.

It is not necessary to constitute a deviation that the risk should be increased : 1 Phil. on Ins. 564, ch. 12, § 1 ; Hand *v*. Raynes, 4 Wheat. 204 ; Maryland Ins. Co. *v*. Le Roy, 7 Cranch 26.

The court below admitted that the facts amounted to a deviation, but submitted to the jury to say whether the deviation enhanced the risk ; this is error.

The third error, involving the eighth point. The increasing the weight on a barge, thus increasing her draught, would expose her to greater danger. A fair construction of plaintiffs' testimony shows that in a contingency such as happened, the barrels placed on deck increased the risk.

*Veech*, for defendants in error.—The policies were simultaneous, and were *time* policies, not on any particular cargo or vessel, but generally on *any* good barge ; not on any particular voyage but on all voyages for a year. The cargo was not to be taken at *either* the " wells," *or* at " Oil City ;" but the only requirement was, that it should be on barges trading between Pittsburgh and those upper termini. There is therefore no question as to double insurance : 1 Phil. on Ins. §§ 363–365 ; 2 Pars. Mar. Law 99.

As to the fourth error. The one hundred and forty barrels might have been carried on the barge from Oil City. Should the insurers be discharged of the whole because the plaintiffs' agents choose to relieve them of part of the risk ? In Maryland Ins. Co. *v*. Le Roy, the animals put on the vessel were not the " stock" mentioned in the policy, the terms of which made no room for them on the deck.

Here the oil was within the policy, and confessedly, if it had been loaded one mile above its destination, it would have been no defence.

In Hughes *v*. Union Ins. Co., 3 Wheaton 165–6, the opinion in Maryland Ins. Co. *v*. Le Roy is much qualified, and Phillips (vol. i. p. 565, § 984 note 1) says the case is not authority, except that insurers will be discharged by an unnecessary change of risk.

If the oil in bulk was put in greater danger, who must bear the consequences ?

The insured knew nothing of putting the oil there. The master put it there, believing it safe, by direction of the foreman. The insurers are liable, though the remote cause of loss be the negli-

[Phœnix Fire Ins. Co. v. Cochran.]

gence of master and crew (2 Pars. Mar. Law 212, a. 1), if there be no want of good faith or honesty of purpose : 2 Phill. on Ins. p. 609, § 1049 ; American Ins. Co. v. Insley, 7 Barr 223.

As to third error : the jury under the charge of court found the facts ; this was necessary, that the judgment might be reviewed by the Supreme Court : Shryock v. Wagner, 4 Casey 430.

The opinion of the court was delivered, January 8th 1866, by WOODWARD, C. J.—As matter of construction, we hold that the policies sued upon were applicable to petroleum in bulk or barrels, shipped in good barges, trading between the points mentioned in the policies. , These points are mentioned as descriptive of the *barges*, not of the *freight*. Wherever the petroleum was taken on, or delivered, between these points, it was within the policies if the barges upon which it was taken were engaged in trading between those points. This seems to be the necessary construction of the policies, and the court below were right in so reading them.

Whether the placing the one hundred and forty-three barrels of oil upon the deck of the barge after it was moored at Forsyth's landing was such a departure from the contract of insurance as to release the underwriters, was the great question in the cause. The jury found upon adequate evidence that the risk was not increased, and we think the law was properly applied by the court. The opinion of the learned judge upon the question he reserved is so full and exhaustive a discussion of the authorities bearing upon the point, that nothing is left for us to do except to approve of the conclusions which he reached.

The two policies sued upon having been issued by the same company, at the same time, and to the same party, and the loss having been brought within the terms of each, except as the amount of it was greater than the sum mentioned in either policy, but less than the aggregate of both policies, there was no error in ruling that the plaintiffs, if entitled to a verdict, were entitled to recover the full amount of their actual loss.

The judgment is affirmed.